Argued 4 October, decided 23 October, 1905.

**CHRISTENSON *v.* SIMMONS.**

82 Pac. 805.

BOUNDARIES — RELATIVE IMPORTANCE OF CALLS IN SURVEYS.

1. Calls in a survey for natural objects or marked lines and corners prevail over calls for courses and distances, if the calls of the former character are clearly established; but if the evidence leads to the conclusion that the mistake is in the calls for natural or artificial objects, and not in those for courses and distances, the rule is the reverse.

BOUNDARIES — ESTOPPEL BY PARTICIPATION IN LOCATION.

2. Where a highway as laid out divided two tracts of land, and plaintiff assisted the owner of one of them in locating his fence along the highway, and worked the road on one or two occasions, and plaintiff at such times had a contract for the purchase of the other tract, but it was surrendered, and he did not purchase it until after such location and working, he was not estopped to insist that the fence in question was in the highway.

From Marion: WILLIAM GALLOWAY, Judge.

This is a suit for an injunction by M. Christenson against Grover Simmons, resulting in a decree as prayed for, from which defendant appeals.          AFFIRMED.

For appellant there was a brief over the names of *John H. McNary*, District Attorney, *Myron Edwin Pogue*, and *Charles Linza McNary*, with oral arguments by *Mr. Pogue* and *Mr. C. L. McNary*.

For respondent there was a brief and an oral argument by *Mr. Frank Holmes*.

MR. CHIEF JUSTICE WOLVERTON delivered the opinion.

The defendant is a road supervisor, and the appellant here from a decree of the circuit court enjoining him from removing a fence constructed by plaintiff. The question presented for our determination is mainly one of fact, which is whether the plaintiff's fence was constructed and is being maintained along and within a public road of the county. The road in question was laid out and established by the county court of Marion County in June, 1879, being 30 feet in width. The location and route, as shown by the field notes and plat of Seth R. Hammer, the surveyor, are as follows:

"Beginning at the corner of Anderegg and Beer's land on the south side of the Brooks and Howell prairie road at the east end of the bridge across Little Pudding River, from which a W. fir tree 20 inches in diameter bears S. 50° W. 32 links, and a Red fir 30 inches in diameter bears N. 20° E. 41 links; thence south 10.29 chains to J. A. Hughes' N. E. corner; thence south 44.61 chains to J. A. Hughes' S. E. corner; thence east 12.14 chains; thence south 2.00 chains to George McCorkle's N. W. corner; thence south 10.96 chains set one mile post," etc.

The plaintiff is the owner of the land on the north of the road and bordering upon it where its course is east from J. A. Hughes' southeast corner, and one Fred Hazelbacker is the owner on the south. The center line of the road should be the dividing line between their respective premises, and the dispute had its origin between these parties. In 1897 Hazelbacker purchased a piece of school

land adjoining his premises on the north, which extended them to the line in question. Desiring to inclose this piece with the rest he constructed a fence on the north, endeavoring, as he testifies, to leave without it more than sufficient space for one half the road. He had no survey made at the time but depended, as he. asserts, upon the location of a stake at the east angle of the road where it turns south, thence running to McCorkle's northwest corner.

Duncan Ross, who was at the time road supervisor, pointed out the stake. Ross testifies as to this: "We found a stake by the hazel bush. We cut away some of the brush to get in to it. The stake was sticking up that far, marked on two sides, so with my permission he took the stake up and put a rock in there." Antedating this, for the purpose of identifying the locality of the road as established upon the ground, and the stake alluded to, the defendant called J. L. Wood, who testifies that he helped cut out the road in about the year 1878 or 1879; "that the marks and everything through there, blazes and everything, showed that it had been surveyed before"; and that a stake then stood at each angle of the road, one next to Joe Hughes' corner on the west end, and one at the angle on the east end; that the one at the east stood a little north and a little west (8 or 10 feet) of an oak, and just north of the center of the road before the plaintiff put his fence there. Describing the stake, witness further says: "I think.it was an oak stake and square at the top," but "it might have been a willow." The last time he remembers having seen the stake was in 1887, as also the one at the west end. He further says that there were roads through there before any was laid out.

Willard Jefferson testifies that he acted as chain bearer when the road was surveyed by Hammer, and that a stake was driven at both the west and east angle of the road;

that the one at the west would not be a great ways from the corner recently established by Herrick; that there were two witness trees there at the time the road was surveyed, one being a fir, the stump of which remains there now, and the other a pine that was a little southeast of the corner; that on the east end there were two witness trees, one a small oak that stood northwest of the corner, and the other was situated a little southeast, but that at the present time he could not locate the position of the stake exactly; that he might vary two or three feet, possibly ten; that the stake had surveyors' marks on it; that when put down it was green, but that when he saw it last, about 1890, it was considerably rotten; that it was not sufficiently preserved that he could swear it was the same stake; that if he would see it to-day he would not say it was the same; all that he had to go by were the surveyors' marks.

Fred Hazelbacker testified that a stake stood in the hazel brush marked "R" when he went there in 1887; that it was taken out and replaced with a rock in 1897, there being present when it was done himself and his brother and Christenson, who assisted in the matter, and his hired man; and that the rock remained in place until recently removed by some one whom he could not identify. He further testified that Christensen assisted him in making the measurement for the location of his fence, and helped him build the fence; the same being constructed 21 feet north of the center of the road as indicated by the stake. This testimony of Hazelbacker is corroborated by his brother.

On the other hand, the plaintiff Christenson testifies that he was first acquainted with the road in 1898; that he bought the land north of the road in 1902, and has been in possession since then as owner; that he previously had a contract for it and was in possession in

pursuance thereof, but gave it up. As it respects the stake, he continues:

"I was there to see for a witness, and there was a stake standing in that corner here where he put the rock down; that stake was lost; there was a big brush pile piled up there for about 15 or 20 feet along, quite high pile, it was about three feet long; it was lost in the brush pile, a willow stake; Hazelbacker held the stake and Fred Hazelbacker cut out the brush and cleaned it out; then he took the shovel and dug the dirt around the stake for about 20 inches wide, then they put that down that deep and the stick was all that was down in the ground; then they threw down this dirt down six inches. I said there is something wrong; I said that stake ought never be in the ground; I drove it 12 or 14 inches and still saw no mark of the stake; and Hazelbacker said that don't make any difference anyway, this here is only temporary, and it can be taken out by the surveyors; I said that stake cannot be within 100 feet of the right place; that was all that was said then; they dropped down the rock."

B. B. Herrick, county surveyor, who appears to have been sent out by the county court for the purpose of locating the piece of road in question, if possible, testifies that he made a survey of that part of the road; that he ran that far from the beginning point; that he found the point described in the field notes of Mr. Hammer as J. A. Hughes' southeast corner, and also the McCorkle northwest corner; that he found an iron rod near the southeast corner of J. A. Hughes' land driven into the ground; that it was located a few inches — 8 or 10 probably — south of where he located the corner by taking careful measurements from a witness tree; that his estimates were based on the stump of the government witness tree that stood to the northeast; that the other two witness trees were gone; that the road follows the south boundary of Elijah Woodward's donation land claim.

W. J. Culver testifies that, when the plaintiff purchased his land, he (witness) made a survey of it; that he located

the southwest corner of the Woodward donation land claim; that he found a stump of a fir tree which stood northeast of the corner, which he supposed was a witness tree; and that he marked the corner with an iron rod driven in the ground.

Aside from this testimony there is much that was introduced, bearing upon the location of the road as actually used by the public. But, prior to 1897, such user was so variable that it is wholly unreliable upon which to base a road by prescriptive right. The testimony can only serve, if for any purpose, to assist in determining the true line of survey. The facts seem to be that, until Hazelbacker built his fence, there was no certain or definite line of travel. Sometimes it would run more nearly where the plaintiff has constructed his fence and sometimes upon the other side where Hazelbacker has his, and for much of the time it was variable, crossing from one side to the other, so that there could be no establishment of the road in the present case by prescriptive use. We are therefore confined to a determination of the true location of the county road as established by the county court. The field notes and plat of the road as returned by Hammer do not show that any stake or monument was erected by him at the east end of the section of road in dispute. Hughes' southeast corner was established by the general government, and there is no dispute as to the exact locality of McCorkle's northwest corner. Both Culver and Herrick, by their recent surveys and measurements, ascertained and reëstablished quite satisfactorily the Hughes corner, which should be identical with the Woodward southwest corner. True, they disagree by 8 or 10 inches, but both resorted to the same mode of establishing it—that of measuring from a government witness tree, the stump of which still remained. We should think, therefore, that their ascertainment of this corner is as nearly accurate as

could be under the present conditions. At any rate it cannot be far wrong, and there could be no such a discrepancy as 21 or 22 feet as claimed by the defendant. This being established, the course of the road is thence east the distance 12.14 chains, thence south 2 chains to McCorkle's northwest corner. Herrick's survey shows the distance east to a point 2 chains south of the McCorkle corner to be 11.83 chains only, and thus there is a discrepancy in measurement.

The evidence also as to the existence and position of a stake at the east end is strong, and, were it not for the conflicting testimony of the surveyors, would be very convincing. The witnesses do not entirely agree among themselves as to the description of the stake, one saying it was an oak, but he was not certain and admits that it might have been a willow, that it was square at the top, another, that it was marked on both sides, and another, that it had the surveyor's marks upon it, namely, the letter "R"; but Christenson says the stake he saw was a willow and that he did not see any marks upon it. Then again, there is some disagreement as to the exact locality. Wood could not place it, admitting that he might be mistaken as much as 10 feet. This witness further indicates that there were witness trees from which it was established. In this he is probably mistaken, as Hammer's survey shows no such witness trees, and there was no government monument established at that point, so that it is more than likely that the witness trees never existed. It is more likely that a stake was put down in that vicinity marked "R," because the road turns a right angle at the point surveyed by Hammer; but his field notes do not even show that. It is natural that they should show it if one was established. Another feature about the monument is that, when Jefferson saw it in about 1890 it was considerably rotten, not sufficiently preserved that he could identify it positively,

and that all he had to go by were the surveyors' marks. If the stake was an oak one, it would last much longer than if it was a willow. If the latter, it could scarcely have remained sound enough to have been driven in the ground.

Another feature that militates strongly against the probability of the monument being established at the point claimed by the witnesses is the fact that the true corner should be but two chains north of McCorkle's northwest corner; the true position of the latter point being conceded by all. It is hardly possible that Hammer could have made a mistake of one third of a chain in measuring a distance of but two chains. There can be no mistake as to the distance shown in the field notes, nor is it scarcely possible that there could have been such a variation from the true east course in running 12.14 chains, a little over one eighth of a mile, as to make the difference of 22 feet at the west end, so that the problem is reduced to the result that, either the two surveyors are wrong in their location of the monument at the west end of this section of the county road, or the defendant and his witnesses are mistaken as to the establishment and location by Hammer of the monument claimed by them at the east end.

1. The ascertainment of the true position of either monument, if established, would afford ample data by which to trace the location of the road by course and distance. It is a rule of law that, where there is a conflict or disagreement between courses and distances on the one hand, and lines and monuments on the other, the latter will control. In other words, as stated in the headnote to *Johnson* v. *Archibald*, 78 Tex. 96 (14 S. W. 266, 22 Am. St. Rep. 27). "Calls in a survey for natural objects or marked lines and corners prevail over calls for courses and distances." This must be taken with a grain of qualification — that calls of the former character must be clearly and definitely estab-

lished, and when so established the rule applies. If, however, the evidence is of a character to lead to the conclusion that the mistake is in the calls for natural or artificial objects and not in those for courses and distances, the rule is the reverse: *King* v. *Brigham*, 19 Or. 560 (25 Pac. 150); *Albert* v. *Salem*, 39 Or. 466 (65 Pac. 1068, 66 Pac. 233); *Johnson* v. *Archibald*, 78 Tex. 96 (22 Am. St. Rep. 27, 14 S. W. 266).

Now to apply the rule. The courses, as run by Herrick in his endeavor to trace the Hammer survey, disagree $^{31}/_{100}$ of a chain in the call thence east from Hughes' southeast corner, but as to the succeeding call it agrees perfectly. If we should adopt the defendant's contention, there would be a disagreement in the call "thence south 2.00 chains to McCorkle's N. W. corner" by 21 feet or more, and the preceding call for the course would manifestly not conform to the original survey, for Jefferson testifies that there was a stake driven down when Hammer made his survey at the west end or angle not a great ways from where Herrick recently established the corner. He further says that there were two witness trees standing there at the time Hammer surveyed the road; one of them being "this fir stump that remains there now," and the other a pine that stood southeast of the corner, just a little, thus identifying the very monument from which Herrick was enabled to reëstablish accurately the Hughes corner. If such is the true position of the stake set at the west angle, an east course would run to the north of the alleged east monument by more than 21 feet. So that as to these two calls for courses and distances there would be utter disparagement, if defendant's contention as to the true location of these monuments be adopted We are strongly impressed, after a careful consideration of all the testimony in the case, that the testimony of Culver and Herrick as to the true position of the Hughes southeast

corner is much more reliable and satisfactory than the testimony of defendant's witnesses touching that of the alleged monument at the east angle. Taking the reëstablished corner as the true one, the rest is satisfactorily solved, except there is a slight discrepancy in distance in the east course, and this is more readily accounted for than the discrepancies that would appear if defendant's theory were adopted. We conclude, therefore, that the Herrick survey correctly retraced the Hammer survey, and that it should be adopted in ascertaining the true location of the portion of the road in question.

2. It is further urged that plaintiff should be estopped to claim that the road was located elsewhere than as claimed by defendant, because he assisted Hazelbacker to locate his fence and had worked the road to the north of it on one or two occasions. However, at neither of the dates referred to was plaintiff the owner of the land bordering the road on the north. He probably had a contract for the purchase of it, but it was surrendered; and plaintiff did not purchase until 1902, so that his acts in the respect noted could not operate to estop him from insisting that the road was located differently.

The decree of the circuit court will therefore be affirmed, and it is so ordered.                    AFFIRMED.